D. Angus Lee, OSB No. 213139
ANGUS LEE LAW FIRM, PLLC
9105 NE Highway 99, Suite 200
Vancouver, WA 98665-8974
(360) 635-6464
angus@angusleelaw.com

Endel Kolde
(pro hac vice)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW, Suite 801
Washington, D.C. 20036
(202) 301-1664
dkolde@ifs.org

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| BRUCE GILLEY,<br><br>    *Plaintiff,*<br><br>v.<br><br>TOVA STABIN, in her individual capacity; and the COMMUNICATION MANAGER of the University of Oregon's Division of Equity and Inclusion, in his or her official capacity,<br><br>    *Defendants.* | Case No. 3:22-cv-01181-HZ<br><br>FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF |

FIRST AMENDED COMPLAINT - 1

INTRODUCTION

"The protections of the First Amendment apply no less to the 'vast democratic forums of the Internet' than they do to the bulletin boards or town halls of the corporeal world." *Garnier v. O'Connor-Ratcliff*, Nos. 21-55118, 21-55157, 2022 U.S. App. LEXIS 20719, at \*62 (9th Cir. July 27, 2022). "When state actors enter that virtual world and invoke their government status to create a forum for such expression, the First Amendment enters with them." *Id.*

Oregon's flagship state university has a Division of Equity and Inclusion ("Division"), whose communication manager posts content on the topics of diversity, equity, and inclusion on the social media platform Twitter, using the Division's official account. She recently posted a "Racism Interrupter" prompt, which was open to comments by other Twitter users. But when Bruce Gilley posted "all men are created equal," she blocked him from the Equity Division's Twitter account, because he promotes a colorblind viewpoint with which she, and her employer, disagree. The communication manager's blocking constitutes impermissible viewpoint discrimination, and it violates the First Amendment.

Prior to this lawsuit's filing, the University of Oregon claimed that the communication manager had complete autonomy to exercise "professional judgment" when blocking users; but after the filing of this lawsuit, the university revealed that it maintains social media guidelines which call for officials to block users whom the communications manager considers to be "hateful" or "racist" or who offend people or are "otherwise inappropriate." These guidelines codify

viewpoint discrimination, especially when placed into the hands of officials who seek ideological indoctrination.

JURISDICTION AND VENUE

1.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action challenges Defendants' violation of Plaintiff's civil rights pursuant to 42 U.S.C. § 1983.

2.  Venue lies in this Court per 28 U.S.C. §§ 1391(b)(1) and (b)(2) because all the parties are residents of this judicial district and the events giving rise to these claims occurred and are occurring in this judicial district.

3.  The effects of Defendants' blocking are experienced by Plaintiff in Multnomah County, Oregon, where he works and resides.

THE PARTIES

4.  Plaintiff Bruce Gilley works as an academic. He resides and mostly works in Multnomah County. He uses Twitter mostly in his private capacity and uses it primarily in Multnomah County.

5.  Defendant Tova Stabin, who resides and works in Lane County, Oregon, was employed as the Communications Manager for the University of Oregon's Division of Equity and Inclusion and is housed in the Office of the Vice President of Equity and Inclusion at the time of the decision to block Bruce Gilley. She reportedly retired before the initiation of this lawsuit, but she was still listed as the

FIRST AMENDED COMPLAINT - 3

Communications Manager at the time this lawsuit was originally filed. She is sued in her individual capacity.

6.   The position of Communications Manager for the Division is, upon information and belief, currently unfilled, and the position has been posted for applications. Some unknown person is fulfilling the duties of the position on an interim basis. The Communications Manager for the Division is sued in his or her official capacity.

FACTS

*The University of Oregon is a State Actor*

7.   The University of Oregon is a public state university, organized pursuant to ORS 352.002. The University of Oregon is a taxpayer-funded governmental entity performing governmental functions and exercising governmental powers pursuant to ORS 352.033.

8.   The Division of Equity and Inclusion ("Division") is a part of the University of Oregon.

9.   The Division uses the acronym "DEI."

10.   The acronym "DEI" is also a common acronym for the ideology of diversity, equity, and inclusion.

11.   The Division's official slogan is that it "promotes inclusive excellence by working to ensure equitable access to opportunities, benefits, and resources for all faculty, administrators, students, and community members."

FIRST AMENDED COMPLAINT - 4

12.    The Division promotes its concept of "equity," which it describes as a "structural concept" that "takes into account where people are and where they need to go."

13.    The Division's concept of equity includes discriminating in favor of certain races and genders in order to atone for actual and perceived past discrimination.

14.    The Division promotes its concept of "inclusion," which it describes as a "decision-making process in ways that lead to equity."

15.    The Division's concept of inclusion does not include allowing the expression of viewpoints critical of DEI.

16.    The Division promotes the idea that the United States and the State of Oregon were founded on oppression and remain oppressive and systemically racist to this day.

17.    The Division similarly promotes the concept that the University of Oregon is a systemically racist institution, mired in "colorblindness" as set forth in Exhibit 1 – IDEAL Road Map, which was authored by UO's Vice President for Equity and Inclusion.

18.    The Division claims that its guiding concepts of "equity" and "inclusion" seek to promote equal educational outcomes.

19.    The Division rejects the proposition that state universities should aspire to colorblindness in making educational and employment decisions.

20.    The Division is administered by the Office of the Vice President for Equity and Inclusion (VPEI), which is also part of the University of Oregon.

FIRST AMENDED COMPLAINT - 5

*Tova Stabin and the Communication Manger are state actors and agents of the University of Oregon*

21.    Defendant Tova Stabin was an employee of the University of Oregon VPEI and Equity Division. Her job title was Communication Manager. She was responsible for all of the Equity Division and VPEI's digital communications, external communications, and social media. Her job duties in that role are self-described in Exhibit 2.

22.    The recent job posting for the position of Communication Manager is Exhibit 3, and includes professional competencies and expectations that are ideological in nature.

23.    Ms. Stabin was an agent and acting on behalf of the University of Oregon, a public entity when she blocked Bruce Gilley.

24.    The Communication Manager is an agent acting on behalf of the University of Oregon when he or she makes blocking decisions.

25.    Ms. Stabin is a former diversity consultant and considers herself to be an "avid social justice activist."

26.    In June 2022, Ms. Stabin was responsible for administering the Division's @UOEquity Twitter account, which is the Division's official social media presence on the Twitter platform.

27.    Presently the Communication Manger is responsible for administering the Division's @UOEquity Twitter account, including anyone fulfilling its duties on an interim basis.

FIRST AMENDED COMPLAINT - 6

28.   Twitter is an interactive social media platform, which users can utilize to interact with each other by posting content called "Tweets," commonly accessed via a smartphone application.

29.   The @UOEquity Twitter account was established in 2013, follows over 400 Twitter users and is followed by nearly 1,000 Twitter users.

30.   The @UOEquity account is a public account, and its posts can be read and commented on by any other Twitter user, who is not blocked by the Communications Manager.

31.   Other Twitter users can also reply to posts with their own comments or retweet posts to their own followers if they have not been blocked by the Communications Manager.

32.   The Division's official website invites members of the public to "connect with us" on Twitter and links to the @UOEquity account.

33.   The @UOEquity Twitter account bears the trademark, trade dress, and school colors of the University of Oregon, presents its location as "University of Oregon" and links to "inclusion.uoregon.edu" which is the official webpage of the Division.

34.   The Communication Manager uses @UOEquity Twitter to promote the Division's concepts of diversity, equity, and inclusion or DEI, and therefore is acting on behalf of the University of Oregon, a public institution.

35.   The Communication Manager uses @UOEquity to tweet about various pro-DEI viewpoints on Asian culture, food justice, the harmful effects of harassment

FIRST AMENDED COMPLAINT - 7

and discrimination of LGBTQ people in schools, the historic significance of the nomination of Justice Ketanji Brown Jackson, the transformative journey of Africans to Africans living in America, solidarity discussions centered on social and racial justice, and the International Transgender Day of Visibility.

36.    Followers of @UOEquity Twitter and other Twitter users who are not blocked by the Communication Manager are able to interact with the Communication Manager's posts by liking, retweeting, or replying to the posts. When replying to a post, Twitter users can express their own opinion about a viewpoint expressed in the post. That post then becomes visible to other Twitter users, who may also reply to it, thus conducting a public conversation that would continue under the @UOEquity account, unless a specific user affirmatively chooses to exclude that account from a reply.

37.    Users can also start new conversations about a Tweet by re-tweeting it and including their own comments, which may elicit further replies.

38.    The Twitter functionality of "tweeting" is described at:  TWITTER, *How to Tweet,* https://help.twitter.com/en/using-twitter/how-to-tweet (last visited Sept. 12, 2022).

39.    The Twitter functionality of "replying" is described at: TWITTER, *Reply to Tweets to add your voice,* https://help.twitter.com/en/resources/twitter-guide/topics/how-to-join-the-conversation-on-twitter/how-to-reply-to-a-tweet-on-twitter (last visited Sept. 12, 2022).

FIRST AMENDED COMPLAINT - 8

40.    The Twitter functionality of "re-tweeting" is described at: TWITTER, *How to Retweet,* https://help.twitter.com/en/using-twitter/how-to-retweet (last visited Sept. 12, 2022).

41.    Twitter users who post replies to @UOEquity that express pro-DEI viewpoints, or viewpoints that are uncritical or agnostic toward DEI, are allowed to do so by the Communication Manager, without getting blocked.

42.    One Twitter user posted a reply to @UOEquity in July 2022 that he was bullied by the "UO university police" because they knew he was Jewish.

43.    Another user replied in May 2022 that the user "really enjoyed" Bryant Terry's talk on BLM and Food Justice, which had been promoted by @UOEquity.

44.    Another user replied in May 2022 that "Spirted Away," a film promoted by @UOEquity, was a "Great film."

45.    Another user replied in April 2022 that she was disappointed that antisemitism was the "sole focus" of a local campaign to combat "propaganda" and that "anti-trans messages" were just a footnote.

46.    Another user replied in February 2022 that Black Studies was her major, accompanied by several heart emojis and an exclamation mark. Two of the heart emojis were green, which is one of the University of Oregon's school colors.

*The Racism Interrupter prompt and Gilley's quote from
the Declaration of Independence*

47.    Defendant Stabin, and also the acting Communication Manager, has used @UOEquity Twitter to post what is called a "Racism Interrupter." The Racism

FIRST AMENDED COMPLAINT - 9

Interrupter consists of a quotation or prompt, designed to provoke a discussion about racism or DEI.

48.   On or about June 14, 2022, Stabin used @UOEquity to post one such Tweet stating "You can interrupt racism" with the prompt "It sounded like you just said _____. Is that really what you meant?" The prompt was presented on a yellow and green field with the University's and Division's logos and the label "RACISM INTERRUPTER" underneath the prompt.

49.   Below is a screen shot of the above-referenced tweet.



50.   When posting the Racism Interrupter prompt, on or about June 14, 2022, Defendant Stabin acted in her official role as VPEI Communication Manager.

FIRST AMENDED COMPLAINT - 10

51. When doing so, she was also promoting the viewpoint that some statements may reflect subconscious or implicit racial bias, even if they were not intended to promote racist views, so long as they are subjectively interpreted as racist by any listener who is also a person of color or "BIPOC" and is not white, so-called "white adjacent," or "enacting whiteness."

52. Bruce Gilley is a professor at another university in Oregon.

53. He is the chapter president of the Oregon Association of Scholars. He is also a member of the Heterodox Academy and supports its mission to encourage viewpoint diversity in higher education.

54. Bruce Gilley categorically rejects his employer's claims that his university sits on "stolen land" and resists attempts by his employer to impose the ideology of diversity, equity, and inclusion on campus. He has previously declined to sign a "black lives matter" statement because it amounts to an ideological pledge. He also resists what he views as the ideological indoctrination of students.

55. Bruce Gilley is a critic of the DEI principles promoted by the defendants, because he believes that DEI calls for discrimination against university faculty, students, and applicants who are not members of groups favored by defendants.

56. He also believes that the principles they promote are based on what is called "critical theory," which threatens freedom of thought at Oregon universities; including by labeling competing ideas, such as colorblindness, as "racist," "white supremacist," "oppressive," and otherwise "unsafe" to express in public.

FIRST AMENDED COMPLAINT - 11

57. Professor Gilley is a known critic of the ideology of DEI as it is practiced at the University of Oregon and at other public universities in Oregon.

58. Bruce Gilley expresses his viewpoints in various forums, including on Twitter, using his account @BruceDGilley.

59. On June 14, 2022, Bruce Gilley used Twitter to re-tweet the @UOEquity's Racism Interrupter prompt with the statement "all men are created equal," which is a quote from the U.S. Declaration of Independence, and promotes his viewpoint of colorblindness and equality, not equity. This colorblindness principle is also reflected in the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution and numerous anti-discrimination laws.

60. In his re-tweet of the Racism Interrupter prompt with his own comment, Gilley also tagged @uoregon and @UOEquity, which would cause the re-tweet to become visible to the account administrator.

61. Below is a screen shot of the above-referenced re-tweet.



62. On June 14, 2022, defendant Stabin, acting in her official role as VPEI

Communications Manager and administrator of the @UOEquity Twitter account,

blocked Bruce Gilley from the account.

63. Below is a screen shot of the above-referenced block notification.

FIRST AMENDED COMPLAINT - 13



64.    Blocking @BruceDGilley on Twitter prevents Bruce Gilley from viewing,

replying, or retweeting any of @UOEquity's posts, including sharing them with his

own Twitter followers. Blocking also removed Bruce Gilley's "all men are created

equal" reply from @UOEquity's timeline and prevented other users from viewing it

or interacting with it, and with Gilley, including followers of the @UOEquity

account.

FIRST AMENDED COMPLAINT - 14

65.   The Twitter functionality of "blocking" is described at: TWITTER, *How to block accounts on Twitter,* https://help.twitter.com/en/using-twitter/blocking-and-unblocking-accounts (last visited Sept. 13, 2022).

66.   Defendant Stabin blocked Bruce Gilley because she and her employer disagree with the viewpoint expressed by his re-tweent and also the quote from the Declaration of Independence that "all men are created equal."

67.   Defendant Stabin also believed that Prof. Gilley's opinion is critical of DEI ideology and she wishes to suppress his viewpoint, including to Twitter followers of @UOEquity.

68.   On July 5, 2022, after Bruce Gilley filed a public records request for the policy utilized by VPEI to block Twitter users, the University of Oregon informed him that there was no written policy and that the "staff member that administers the VPEI Twitter account and social media has the autonomy to manage the accounts and uses professional judgment when deciding to block users."

69.   In the same public records request response, the University of Oregon also informed Gilley that two other Twitter users were blocked from the @UOEquity.

70.   Both of the other users have expressed politically conservative viewpoints, including criticizing posts of the @UOEquity account. One reply by a blocked user asked "[h]ow are these groups going to a secondary school if they can't read, write, and do math?"

FIRST AMENDED COMPLAINT - 15

71.  Another reply by a different blocked user stated "Diversity, Equity, and Inclusion departments are Marxist poison and should be eliminated from every institution in America."

72.  As of the time this lawsuit was originally filed, August 11, 2022, @BruceDGilley remains blocked from the @UOEquity account. He was unable to express his views in replies or re-tweets.

73.  Even though UO has temporarily unblocked Bruce Gilley in response to this lawsuit, he remains concerned that he could be blocked again in the future for expressing a viewpoint critical of the ideology of diversity, equity, and inclusion, thereby inviting self-censorship. He does not want to file a federal lawsuit every time he expresses an opinion on Twitter with which the Communication Manager disagrees.

74.  On September 2, 2022, UO for the first time disclosed to Plaintiff that "The social media guidelines published by UO's communications unit are here: https://communications.uoregon.edu/social-media-guidelines. The statement we provided to Prof. Gilley on July 5 was inaccurate. The university's actual stance on blocking social media commentators is set forth in the link above." This communication has been filed as ECF No. 25-4.

75.  UO's social media guidelines disclosed on September 2, 2022 are attached as Exhibit 4.

76.  The guidelines allow the Communication Manager or other UO social media officials to block or suppress social media users who post "hateful or racist

FIRST AMENDED COMPLAINT - 16

comments or otherwise uses offensive or inappropriate language."

77.    The guidelines also allow the Communication Manager or other UO social media officials to permanently "ban" social media users for "egregious" or "repeated" posts.

78.    The guidelines also require the Communication Manager and other UO social media officials to follow the Twitter terms of service.

79.    Bruce Gilley does not know how UO defines the terms "hateful," "racist," "offensive" or "otherwise inappropriate" as used in UO's social media guidelines, and he knows from experience that adherents to the DEI ideology have expansive conceptions of those terms that differ from his own and from those of many other Americans.

80.    Bruce Gilley is concerned that UO's social media guidelines will be used to censor him in the future if he interacts with @UOEquity or another UO Twitter account and posts information that may be deemed by someone to violate the guidelines. Having already been blocked once, he is also concerned that he might be subject to a permanent "ban" as provided by UO's guidelines for repeated posts that might offend the Communication Manager or another UO social media official.

81.    In order to avoid being blocked again, or risk a permanent ban, under UO's social media guidelines, Bruce Gilley intends to self-censor until his rights can be adjudicated in court. In addition, even if he did comment in the forum that is interactive portion of @UOEquity account, or any other UO Twitter account, he

FIRST AMENDED COMPLAINT - 17

would have to hedge and trim his message and make it less effective in order to avoid offending the Communication Manager or any other UO social media official.

FIRST CLAIM FOR RELIEF
RIGHT OF FREE SPEECH, U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
AS-APPLIED CHALLENGE TO TWITTER BLOCKING

82.   Plaintiff realleges and incorporates by reference paragraphs 1 through 81.

83.   The First Amendment embodies "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). The government may not silence speech because it criticizes government officials or employees, or their favorite ideas or principles, even if that speech does so in ways that many people may find unpleasant. Allegations that speech is disrespectful, unsafe, or offensive do not justify censorship of public speech. The ideology of DEI is not less subject to criticism than any other set of opinions and beliefs.

84.   First Amendment protections extend to replies, re-tweets, or comments posted by users in response to posts by government officials using official state-university Twitter accounts, including @UOEquity, by operation of the Fourteenth Amendment.

85.   The interactive portions of @UOEquity's Twitter page, including the reply and re-tweet features, constitute a designated public forum where state actors may

impose only viewpoint neutral time, place, and manner restrictions that are narrowly drawn.

86.   In the alternative, the interactive portions of @UOEquity's Twitter page, including the reply and re-tweet features, constitute a limited public forum, where state actors may only impose restrictions that are viewpoint-neutral and reasonable, in light of the purposes of the forum.

87.   In both cases, the University of Oregon has created the @UOEquity Twitter account to engage with the public and to solicit feedback. Its purpose is to interact with the public and to foster exchange. That is a public forum.

88.   Defendant Stabin was a state actor acting in the course and scope of her employment when she blocked, and up until the time of her retirement, continued to block, Bruce Gilley from the @UOEquity account.

89.   Defendant Communication Manager is a state actor acting in the course scope of his or her employment when deciding to block or ban speakers from the @UOEquity Twitter account.

90.   Defendant Stabin acted in a viewpoint discriminatory manner when she blocked Bruce Gilley from the @UOEquity Twitter account.

91.   Defendants have a pattern and practice of blocking Twitter users from the @UOEquity Twitter account who express viewpoints they disagree with, including viewpoints that are critical of the ideology of diversity, equity, and inclusion or the Division.

FIRST AMENDED COMPLAINT - 19

92.    Defendant Stabin, by blocking Gilley, also failed to implement a narrowly tailored content-neutral time, place, and manner restriction.

93.    By enforcing viewpoint discriminatory Twitter blocking, Defendants, under color of law, deprived Plaintiff, and other similarly situated persons, of the right to free speech in violation of the First and Fourteenth Amendments to the United States Constitution. Accordingly, Plaintiff Gilley is damaged in violation of 42 U.S.C. § 1983, and, therefore, is entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

SECOND CLAIM FOR RELIEF
RIGHT OF FREE SPEECH, U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
FACIAL CHALLENGE TO TWITTER BLOCKING CUSTOM, POLICY AND PRACTICE

94.    Plaintiff realleges and incorporates by reference paragraphs 1 through 81.

95.    Twitter blocking policies in designated public forums must be guided by objective, workable standards, otherwise they invite excessive discretion and application of the state official's own opinions and political biases. *See, e.g., Minn. Voters All. v. Mansky,* 138 S. Ct. 1876, 1891 (2018).

96.    VPEI and Stabin's originally disclosed custom, policy, and practice of granting Defendant Stabin uncabined autonomy and "professional judgment" to make blocking decisions invites subjective and viewpoint discriminatory blocking decisions. It also does not provide users with any notice as to what content posting may result in blocking.

FIRST AMENDED COMPLAINT - 20

97.    The use of subjective and malleable judgment to screen content makes the interactive portions of the @UOEquity a designated public forum.

98.    By enforcing VPEI's and Stabin's uncabined-blocking custom, policy and practice, Defendants, under color of law, deprived and continue to deprive Plaintiff, and other similarly situated persons, of the right to free speech in violation of the First and Fourteenth Amendments to the United States Constitution. Accordingly, Plaintiff is damaged in violation of 42 U.S.C. § 1983, and, therefore, is entitled to nominal damages, declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

THIRD CLAIM FOR RELIEF
RIGHT OF FREE SPEECH, U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
FACIAL CHALLENGE TO UO'S SOCIAL MEDIA GUIDELINES

99.    Plaintiff realleges and incorporates by reference paragraphs 1 through 81.

100.    OU's social media guidelines in either designated public forums or limited public forums must be guided by objective, workable standards; otherwise they invite excessive discretion and application of the state officials' own opinions and political biases.

101.    Similarly, standards for inclusion and exclusion in limited public forums must be unambiguous and definite. Absent objective standards, government officials may use their discretion to interpret the policy as a pretext for censorship. *See, e.g., Hopper v. City of Pasco,* 241 F.3d 1067, 1077-78 (9th Cir. 2001).

FIRST AMENDED COMPLAINT - 21

102. UO's social media guidelines do not sufficiently define the terms "hateful," "racist," or "otherwise offensive" or "inappropriate" language to sufficiently limit official discretion or put users on notice as to what type of content is allowed to be posted in response to @UOEquity posts or any other official UO social media content.

103. UO's social media guidelines allow the Communication Manager and other UO social media officials to import their own biases and assumptions into defining the scope of the guidelines, especially if they are adherents of the DEI ideology, who see racism and discrimination as present in many situations.

104. In addition to allowing for excessive enforcement discretion, UO's social media guidelines are too vague to give reasonable social media users notice as to what content may be posted in the interactive portions of @UOEquity and other UO social media accounts.

105. In addition to being vague, UO's social media guidelines are overbroad because any legitimate sweep of a ban on "hateful," "racist," or "otherwise offensive" or "inappropriate" content will also reach too much protected speech to pass constitutional muster. Such protected speech, includes, for example, Gilley's re-tweet and the content posted by the two other DEI critics the Communication Manager blocked from @UOEquity.

106. This vagueness, overbreadth, and excessive enforcement discretion forces users such as Bruce Gilley to self-censor when interacting with @UOEquity and other UO social media accounts.

FIRST AMENDED COMPLAINT - 22

107. UO's social media guidelines enshrine viewpoint discrimination because they call for the censorship of protected speech including opinions that some people might find hateful, racist, inappropriate, or otherwise offensive; including particularly viewpoints that dissent from the prevailing ideology of DEI at UO.

108. The First Amendment's viewpoint neutrality principle protects more than the right to identify with a particular side. It protects the right to create and present arguments for particular positions in particular ways, as the speaker chooses, including in ways that some people may find offensive. *See, e.g., Matal v. Tam,* 137 S. Ct. 1744 (2017).

109. In addition to discriminating based on content and viewpoint, UO's social media guidelines give the Communication Manager and other UO social media officials discretion to permanently "ban" or "hide" users who post content that the manager or official finds to be "egregious" or repeated.

110. Permanent bans from public forums such as the interactive portions of a @UOEquity or other UO Twitter accounts are disproportionate and lack narrow tailoring.

111. UO's social media guidelines also appear to incorporate Twitters terms of service into blocking decisions. As a state actor, UO may not use Twitter's terms of service, or collude with any private party, to effectuate illegal censorship of dissenting viewpoints posted in a public forum, such as the interactive portions of any UO Twitter account.

FIRST AMENDED COMPLAINT - 23

112. Even though UO has given confusing and contradictory information about which criteria the Communication Manager uses to make blocking decisions, Plaintiff is entitled to bring a pre-enforcement challenge against UO's social media guidelines because they could be applied to him and content he posts in the future.

113. By enforcing UO's social media guidelines, Defendants, under color of law, deprive and continue to deprive Plaintiff, and other similarly situated persons, of the right to free speech in violation of the First and Fourteenth Amendments to the United States Constitution. Accordingly, Plaintiff is damaged in violation of 42 U.S.C. § 1983, and, therefore, is entitled to nominal damages, declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

FOURTH CLAIM FOR RELIEF
RIGHT OF FREE SPEECH, U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983
AS-APPLIED CHALLENGE TO UO'S SOCIAL MEDIA GUIDELINES

114. Plaintiff realleges and incorporates by reference paragraphs 1 through 81.

115. UO previously stated that the Communication Manager applied "professional judgment" in blocking Bruce Gilley and others from @UOEquity. Defendants have since revealed the existence of the UO social media guidelines.

116.  To the extent Defendants claim that the UO social media were used to block Bruce Gilley and other DEI critics from @UOEquity, those guidelines invited excessive discretion and viewpoint discrimination as-applied to his re-tweet with

the comment "all men are created equal." The terms are also vague as applied to his
re-tweet and comment.

117.    The comment "all men are created equal" is not "hateful," "racist," or
"otherwise offensive" or "inappropriate." The comment is also not off-topic for the
Racism Interrupter Tweet, which invited a discussion about racism and DEI
concepts, and relates to the purposes of the forum.

118. By enforcing UO's social media guidelines, Defendants, under color of law,
deprive and continue to deprive Plaintiff, and other similarly situated persons, of
the right to free speech in violation of the First and Fourteenth Amendments to the
United States Constitution. Accordingly, Plaintiff is damaged in violation of 42
U.S.C. § 1983, and, therefore, is entitled to nominal damages, declaratory and
preliminary and permanent injunctive relief against continued enforcement and
maintenance of Defendants' unconstitutional customs, policies, and practices; and
attorney fees and expenses pursuant to 42 U.S.C. § 1988.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Bruce Gilley, requests judgment be entered in his favor
and against Defendants Tova Stabin and the Division's Communication Manager as
follows:

A.  An order permanently enjoining the Communication Manager, and his or her

    officers, agents, servants, employees, and all persons in active concert or

FIRST AMENDED COMPLAINT - 25

participation with the Communications Manager who receive actual notice of the injunction:

1) To permanently unblock @BruceDGilley from the @UOEquity Twitter account;

2) From discriminating on the basis of viewpoint when blocking users from @UOEquity, including other users who express views critical of the ideology of diversity, equity, and inclusion;

3) Applying overly broad content-discriminatory criteria when blocking users from @UOEquity;

4) Enforcing VPEI and Defendant's subjective custom, policy, and practice of applying "professional judgment" when blocking users from @UOEquity;

5) Enforcing the vague and subjective portions of UO's social media guidelines including the prohibitions on "hateful," "racist," "offensive," or "otherwise inappropriate" speech;

6) Enforcing the permanent "ban" portions of UO's social media guidelines;

7) Using Twitter's terms of service to guide or in any way influence the Communication Manager's blocking decisions; and

8) Colluding with Twitter or any private parties to block or take down Twitter content that is critical of DEI, UO policies, UO personnel, or in any way avoid First Amendment censorship constraints.

FIRST AMENDED COMPLAINT - 26

B. A declaration that Defendants' decision to block Bruce Gilley, apply subjective "professional judgment," or UO'a social media guidelines when making blocking decisions for @UOEquity constitutes a violation of the First Amendment;

C. Nominal damages in the amount of $17.91;

D. Costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

E. Any other relief this Court may grant in its discretion.

Respectfully submitted,                    Dated: September 13, 2022

   *s/Endel Kolde*                 *s/D. Angus Lee*      
Endel Kolde                                 D. Angus Lee
(pro hac vice)                              OSB No. 213139
INSTITUTE FOR FREE SPEECH                   ANGUS LEE LAW FIRM, PLLC
1150 Connecticut Ave., NW                   9105 NE Highway 99
Suite 801                                   Suite 200
Washington, D.C.  20036                     Vancouver, WA 98665-8974
(202) 301-1664                              (360) 635-6464
dkolde@ifs.org                              angus@angusleelaw.com

*Attorneys for Bruce Gilley*

**Exhibit 1**

IDEAL: Our Roadmap for a Fully-Inclusive and
Resilient Campus[i]

Division of Equity and Inclusion
December 10, 2020

Yvette M. Alex-Assensoh
Professor of Political Science &
Vice President, Equity and Inclusion

# IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus

## Contents

Executive Summary: ........................................................................................................................... 3

List of Tables and Charts: .................................................................................................................. 5

Introduction: ...................................................................................................................................... 6

Historical Context of IDEAL: ............................................................................................................. 6

    Inclusion ........................................................................................................................................ 7

    Diversity ........................................................................................................................................ 7

    Evaluation ...................................................................................................................................... 7

    Achievement ................................................................................................................................. 7

    Leadership ..................................................................................................................................... 7

Outcomes for campus ....................................................................................................................... 8

    Goals Met ...................................................................................................................................... 8

    Categories of Tactics .................................................................................................................... 8

    Highlights from Figure 4: ............................................................................................................ 10

    Communities of Practice ............................................................................................................ 10

    Climate ........................................................................................................................................ 11

Developmental Impact of the DAP work ........................................................................................ 12

    DAP Constituencies ................................................................................................................... 13

Catalyzing Change .......................................................................................................................... 14

From Mono-culturalism to Resiliently Inclusive: Data Highlights on the Journey Forward ................ 14

    University Leadership and Officers of Administration ................................................................ 15

    Faculty, Classified Staff, and Graduate Employees .................................................................. 16

    Student Success ......................................................................................................................... 20

    Faculty Achievement .................................................................................................................. 21

Failing Forward and Recommended Next Steps ............................................................................ 24

# IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus

## Executive Summary:

In Spring term of 2017, the UO launched the IDEAL[ii] framework, activating Diversity Action Plans (DAPs) in 35 units, with the audacious goal of implementing 657 tactics.

Just 2.5 years later:

- 58% of DAP tactics were met or in progress.
- Our top DAP focus areas: improving departmental climate, student success, professional development and community outreach.
- Our top three focal groups: undergraduate or graduate students, campus at large, and staff. Very few protected classes received targeted focus.
- Promising practices emerged from our DAP work in the following areas: student internships, implicit bias, active recruitment, institutionalizing diversity committees and professional development. This work will be shared through the communities of practice framework, and as part of the UO implementation of HB2864.
- IDEAL and the DAP work that it generated received the following state-wide, national and professional recognitions: (i) Oregon Department of Education used aspects of IDEAL to build its own internal diversity plan; (ii) the UO Department of Intercollegiate Athletics identified IDEAL as a major partner in BEOREGON, which received the National 2020 NCAA/MOAA Diversity and Inclusion Award; (iii) Communications received 2020 Best of CASE (Council for Advancement and Support of Education) for PATOS: a multimedia approach to supporting the UO Latinx community; and (iv) the UO received its first Insight into Diversity Higher Education Excellence in Diversity (HEED) recognition for excellence in diversity and equity on their campus.

The aforementioned successes provide a firm foundation for the UO to be bolder and more focused in tackling the stubborn, but surmountable inequities that remain:

**Retention**: Black faculty are almost three times more likely to leave the UO than any other under-represented faculty group.

**Representation**:

Native and Pacific Islander faculty continue to comprise the smallest group of UO faculty.

While promotions among women of color through the ranks is improving and representation of women in science is increasing, the movement is much too small and too slow.

**Leadership Ranks**: While the university has made some progress in diversifying its administrative ranks, Native, Pacific Islander and Asian leaders are largely invisible among senior UO leadership ranks. Ongoing attention and support are needed to protect recent gains in gender and racial diversity.

**Awards**: In 2020, campus awards for teaching and research are still disproportionately awarded to faculty who are white and male, leaving much of the expertise that Black, Indigenous, Native, Asian, Desi, Pacific Islander and women bring to our campus under-recognized and under-valued.

# IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus

**Student Success**: Student achievement is improving among most students, with the exception of Black students, who are lagging behind every other group.

**Data Deserts**: There are members of our UO community, for whom we do not collect data in ways that can be shared, including but not limited to our LGBTQIA and disabled students, staff and faculty as well as data faith communities, etc.

To that end, DEI's future work focuses intentionally on (i) leveraging research to better identify and institutionalize accountabilities around retention, achievement, inclusive teaching, employee engagement, and enhancing transformational and anti-oppressive leadership; (ii) building additional capacity for faculty, staff, students and leadership to unlearn behavior that facilitates institutional underperformance and underachievement; (iii) institutionalizing ethics of care and respect as a basis for building a respectful campus climate (iv) leveraging our institutional focus on cultural humility to work more consistently and intentionally against anti-black racism and other forms of racism, colonialism, xenophobia, sexism, homophobia, ableism as well as other forms of harm including discrimination based on religion, language, ideology and geography on campus and in society more generally.

# IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus

## List of Tables and Charts:

**Figure 1** Geography of DAP Tactics.........................................................................................8
**Figure 2** Percentage of tactics met by administrative units and academic units......................8
**Figure 3** Distribution of met tactics from unit DAPs to the five pillars of the IDEAL Framework...........9
**Figure 4**  Categories of tactics; number of units engaged in work in that category, and percentage of tactics that the work represents. ....................................................9
**Figure 5**  Units across campus employing similar DAP tactics ...........................................11
**Figure 6** Update on Climate Survey Work.........................................................................11
**Figure 7** Impact that units' met tactics have in affecting change across campus..................12
**Figure 8** Constituencies served through units' met DAP tactics .........................................13
**Figure 9**  Underrepresented groups specifically served through units' met DAP tactics.....................14
**Figure 10** Compares UO Administrators' gender and ethnicity in 2015 to 2020. Source: UO Institutional Research.........................................................................15
**Figure 11**  Officers of administration of color as a percentage of all OAs from AY 2010 to AY 2019. Source: UO Institutional Research.........................................16
**Figure 12** Tenure track faculty of color as a percentage of all TTF from AY 2010 to AY 2019. Source: UO Institutional Research.........................................16
**Figure 13** Non-tenure track faculty of color as a percentage of all NTTF from AY 2010 to AY 2019. Source: UO Institutional Research.........................................17
**Figure 14** Women in the Sciences 2015 V 2020 .................................................................17
**Figure 15** Classified staff of color as a percentage of all classified staff from AY 2010 to AY 2020. Source: UO Institutional Research.........................................18
**Figure 16** Graduate employees of color as a percentage of all GEs from AY 2010 to AY 2019. Source: UO Institutional Research.........................................18
**Figure 17** Percent of faculty hired since AY 2013-14 who are no longer at the UO in AY 2019-20. Source: UO Institutional Research.........................................19
**Figure 18** Female tenure related faculty of color in 2015 and in 2019. Source: UO Institutional Research.........................................................................19
**Figure 19** Other graduation rate trends. Source: Undergraduate Education & Student Success.........20
**Figure 20**  Six-year graduation rates based on beginning cohort years 2010-2014. Source: UO Institutional Research.........................................................................20
**Figure 21** Gender distribution of tenure-related faculty from AY 2010 to AY 2019. Source: UO Institutional Research.........................................................................21
**Figure 22** Gender distribution of non-tenure related faculty from AY 2010 to AY 2019. Source: UO Institutional Research.........................................................................21
**Figure 23** Race/ethnicity distribution of faculty research awards 2013-14 through 2019-20. Source: UO Institutional Research.........................................................................22
**Figure 24** Gender distribution of Faculty Research Awards from 2013-14 through 2019-20. Source: UO Institutional Research.........................................................................22
**Figure 25** Race/ethnicity distribution of faculty teaching awards 2013-14 through 2019-20. Source: UO Institutional Research.........................................................................23
**Figure 26** Gender distribution of faculty teaching awards 2013-14 through 2019-20. Source: UO Institutional Research.........................................................................23

# IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus

## Introduction:

Nationwide, higher education leaders are working with uncommon speed; some might even say scrambling, to address the inequities and institutional racism clearly exposed by COVID-19[iii] and the murders of George Floyd, Breonna Taylor and many others. During this time, it is impossible to turn away from the inculpating evidence of racial, gender, class, ableist, religious, immigrant and sexual oppression that undergirds American life.

Yet, the onset of this Report began almost 5 years ago, when our campus embarked on the work of incorporating IDEAL (Inclusion, Diversity, Evaluation, Achievement and Leadership) into the fabric of campus life. IDEAL represents an important milestone in the UO's overall journey to build capacity for equity and inclusion. Indeed, it is foundational to the more targeted, generative and creative work that lies ahead. The goal of the report is to provide an overview of what we, as a campus, accomplished together. This report provides:

- an introduction to newcomers,
- a high-level analysis for those who were deeply involved in the work, and
- an invitation to the courageous and intentional work that lies ahead.

From the onset of IDEAL in 2016, our goal was to encourage 100% participation. We strove to inspire our UO community members to lean in and dream big as they engaged in the deep, uncomfortable and systemic work that is necessary to achieve transformative change. And dream big they did. At the end of the Diversity Action planning phase, our 35 units had proposed 657 tactics. We encouraged units to design living documents to guide the work moving forward, with the goal of checking in on our status in about three years. Fall 2019 marked the end of the approximately three-year implementation period. We spent the Winter and Spring terms meeting with colleagues, then used the summer to analyze the findings. This report describes what we accomplished together, but more importantly, it sets the stage for more transformative anti-racism, broader anti-oppression and equity work that lies ahead.

## Historical Context of IDEAL:

At the core of the IDEAL framework is a deep love for the people and the State of Oregon. We hope to encourage Oregon to create a better version of itself, one that mirrors the breathtaking beauty of its environment. While Oregon is known for its abundance of trees, lush landscapes, and progressive reputation, much of its history is built on an ugly foundation of racial exclusion and oppression. For example, the University of Oregon is located on Kalapuya Ilihi, the traditional indigenous homeland of the Kalapuya people. Following treaties between 1851 and 1855, Kalapuya people were dispossessed of their indigenous homeland by the United States government and forcibly removed to the Coast Reservation in Western Oregon. Today, descendants are citizens of the Confederated Tribes of Grand Ronde Community of Oregon and the Confederated Tribes of the Siletz Indians of Oregon. They continue to make important contributions in their communities, at UO, and across the land we now refer to as Oregon. Additionally, Oregon also distinguished itself as the only State in the union to ban Black people from settling within its borders with a series of Black exclusion laws starting in 1844. Other major historical atrocities include, but are not limited to, the exploitation of Chinese and Latinx labor and the use of Japanese internment camps. Yet, Black, ADPI, Latinx, Native

# IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus

and Whites contributed to the building of the place that is now known as Oregon. As a leading institution of higher learning, it is important to acknowledge the ways in which racism, oppression and exclusion live on in institutions, policies and processes across our State.

With Oregon's history as an important context, the IDEAL framework is one mechanism for re-fashioning the State and the UO into the better versions of themselves.  At the UO, we feel that acknowledging this history is deeply American, patriotic and an essential entry point for creating the type of systemic change that benefits all in our campus community, and ultimately the entire State. Comprising two levels of interlocking engagement at the campus and unit levels, respectively, IDEAL is designed to engage these complexities. The framework relies on five pillars:

> Inclusion: Cultivating a welcoming environment for all.
> Diversity: Developing and implementing equitable strategies for recruiting, retaining and advancing students, faculty and staff from all backgrounds and experiences.
> Evaluation: Using assessment and measurement to evaluate our progress in meeting the university's goals for equity and inclusion.
> Achievement: Ensuring that our policies, processes and practices provide access for all in reaching their personal best.
> Leadership: Developing, nurturing and coaching leadership to facilitate inclusive environments as well as the resources for success.

At the unit level, individual academic and administrative units employ IDEAL to embed promising practices, improvements and change. Building on the work of the UO's first strategic plan, the coordinating piece of IDEAL was birthed amid rapid campus change and transition. With the support of the University Wide Diversity Committee (UWDC), the initial scope of the plan was formulated in 2013, with the initial rollout in 2014. Before it could it be implemented, two new presidents and the UO Board of Trustees came on the scene. In the midst of previous ongoing change, the UWDC and the President's Diversity Advisory Committee (PDACC) served as steadying bulwarks consistently working with the Division of Equity and Inclusion (DEI) to remind our campus that broad participation and a plan for embedding equity and inclusion were critical to successfully realizing the UO's mission.

After President Michael Schill's appointment in July 2015, the Division of Equity, Inclusion and Diversity— and the UWDC—worked to ensure IDEAL aligned with and supported his three university priorities. An updated committee report was presented to President Schill in early 2016, and a final framework was prepared by the president in spring 2016 in consultation with the VPEI and UWDC. In fall 2016, President Schill announced the implementation of IDEAL as a campus-wide initiative in which every unit was required to engage and develop Diversity Action Plans (DAPs). As part of the charge, President Schill stipulated that each unit should have local control over what it decided to undertake (within the context of best practices and legal guidelines), rather than adhering to university-wide objectives. DEI and a small team of leaders from across campus led the way in providing direction and consultation to help design and review plans for each of the 35 units, and evaluate the extent to which proposals were consistent with best practices. We also convened several working groups[iv] to examine areas of common concern across campus. Faculty, staff and students lent their time and talent to help address a variety of issues with varying levels of completion, including climate surveys, staff onboarding, leadership development and implicit bias.

# IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus

Our team of three DEI colleagues[v], with support from our broader DEI team, worked to provide the units with professional development opportunities, individual consultations and support for implementation questions and challenges, all while championing the learning challenges and successes that occurred along the way. In the section below, we outline the overall outcomes of the Diversity Action Planning process.

## Outcomes for campus

### Goals Met

Through the DAP development process, faculty, staff and students across 35 academic and administrative units proposed 657 tactics. Two and one-half years later, our colleagues made progress on almost 60% of those goals, while fully meeting about a third of all the goals that were set.



*Figure 1* Geography of DAP Tactics

We defined "met" as reaching a stage of completion for each of the specified tactics. As part of the reporting process, each unit specified their progress with tactics, and we used language from their reports to categorize whether tactics were met. We simply trusted each unit to describe what tactics were met, ongoing, or had yet to be started. Since work that is ongoing is not included in the "met" category, there is a much higher percentage of continuing movement taking place than what is represented in Figure I.

Consistent with our goals to encourage ongoing engagement with the diversity action planning/implementation process, we encouraged units to see their DAPs as living and ongoing work that is not only responsive but anticipatory. In that vein, units engaged 20 new tactics along the way because of changing contexts, new leadership, or improved ideas about what should be done.



*Figure 2* Percentage of tactics met by administrative units and academic units

While administrative and academic units used the same IDEAL framework to plan and execute their tactics, our analysis showed differences in the way that the tactics were accomplished. For example, Figure 2 shows that academic units completed a little more than half of the overall campus DAP work, likely because academic units have more bodies to contribute to the work.

### Categories of Tactics

The initial implementation of IDEAL was all about providing a framework for choice to allow units to "get in

# IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus



*Figure 3* *Distribution of met tactics from unit DAPs to the five pillars of the IDEAL Framework*

where they fit in". In the section below, we examine how the tactics aligned with the different pillars of IDEAL.

Figure 3 illustrates that work in the areas of inclusion (cultivating a welcoming environment for all) and diversity (developing and implementing equitable strategies for recruiting, retaining and advancing students, faculty and staff from all backgrounds and experiences) together represented 60% of DAP implementation tactics. This was followed by a focus on achievement. Less than 15% of the units focused on leadership, and only a small segment of our campus targeted evaluation, which was required during the design phase, but not during the implementation phase.

Within each of the IDEAL pillars, units had an opportunity to design their own programs, policies and processes. Figure 4 provides an overview of the major categories of tactical areas, including three types of information: categories of tactics, the number of units engaged, and the percentage of met tactics represented in this tactical area.



*Figure 4* *Categories of tactics; number of units engaged in work in that category, and percentage of tactics that the work represents.*

# IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus

## Highlights from Figure 4:

- Over 50 tactics across academic and administrative units focused on efforts to enhance our campus climate, which represented about one-fifth of all tactics that were met.
- At the lower end of the DAP tactics are research programs, which represent 5 tactics and just under 2% of all met tactics overall.
- Community outreach covered a range of areas that engaged students, suppliers, alumni and friends of UO in efforts to build capacity for equity, inclusion and diversity. It also highlights efforts to nurture development among our community members through professional development opportunities, build a more inclusive leadership culture at the UO and allocate our resources in ways that are more equitable.
- While 8% of all tactics focused on better faculty, staff and student recruitment, another 7% focused on implementing processes to nurture retention across faculty, staff and student populations. These efforts, along with a wide swath of programming focused on student success, are examples of promising work as we focus more intentionally as a campus on ensuring that our students are thriving and prepared for leadership on a global stage.

## Communities of Practice

The decision to allow each unit to select its own focus led to many different types of work. Figure 5, shows the tactics that units approached in common, along with the units engaged in this work. Moving forward, there is an opportunity to bring these units together to create communities of practice--groups that work collaboratively to address issues across our campus. In a forthcoming companion "Happy Talk" report, we highlight contributions from each of our units, providing an opportunity for campus to learn more about what other units worked on as part of the DAP implementation process. Communities of practice also provide the opportunity to scale up best practices for campus-wide use.

| TACTIC | UNITS EMPLOYING TACTIC |
|---|---|
| Implicit Bias and other trainings | ADV, KC, OGC, OtP, SSEM, VPFA, VPRI, VPSL, CAS, CHC, DGE, GRAD, IS, LAW, LERC, LIBR, |
| Active recruitment strategies for hiring, recruitment and retention | KC, OGC, OtP, CAS, COE, IS, LAW, LCB, LIBR UESS |
| Active and engaged diversity committee | ADV, KC, VPFA, CAS, LCB, LIBR |
| Performance evaluations include diversity/inclusion component | ADV, OtP, VPFA, VPSL, ATH |
| Increase services and impact related to student achievement and success | ADV, OGC, OMB, VPFA |
| Policies and procedures reflect an inclusive and welcoming environment | KC, OGC, OMB |
| Provide professional development and service opportunities to staff | SSEM, VPFA, UESS |
| Integrate education on a culture of diversity, equity, and inclusion into divisional employee orientation | SSEM, VPSL, IS |

## IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus

| TACTIC | UNITS EMPLOYING TACTIC |
|---|---|
| Develop programs that support, mentor, and prepare members of underrepresented groups for leadership opportunities, including internship programs | OGC, LAW, UOPDX, VPSL, VPFA, ADV, DEI |
| Exit/Stay Surveys | VPFA, OtP, DEI |
| **KEY:** ADV = Advancement \| ATH = Athletics \| CAS = College of Arts & Sciences \| CHC = Clark Honors College \| COE = College of Education \| COMM = University Communications \| DEI = Equity & Inclusion \| GRAD = Graduate School \| IS = Information Services \| KC = Knight Campus \| LAW = School of Law \| LCB = Lundquist College of Business \| LERC = Labor Education & Research Center \| LIBR = Libraries \| OGC = Office of the General Counsel \| OMB = Ombuds Office \| OtP = Office of the Provost \| SOJC = School of Journalism & Communication \| SOMD = School of Music & Dance \| SSEM = Student Services & Enrollment Management \| VPFA = Finance & Administration \| VPRI = Research & Innovation \| VPSL = Student Life \| UESS = Undergraduate Education & Student Success \|UOPDX = UO Portland | |

*Figure 5* *Units across campus employing similar DAP tactics*

### Climate

Over 70% of the unit plans included a desire to implement a unit-level climate survey. This is understandable because campus climate is linked to retention.

Based on that feedback, we convened a team of colleagues from academic and administrative units to assess the viability of a campus-wide climate survey focused on inclusion and a respectful workplace. This group made recommendations to the President that we commission a climate survey for our entire campus.

Figure 6 outlines the process that was established, including proposal review and the selection of a firm to do the work. However, the contracting process ended during the onset of COVID-19. For understandable reasons, we decided to postpone the campus survey until AY21/22. In the meantime, we are advising units to move forward in rectifying known climate issues in their units and departments, including, but not limited to disrespectful colleagues, unhealthy communication patterns, and micro-aggressions.



*Figure 6* *Update on Climate Survey Work*

# IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus



*Figure 7 Impact that units' met tactics have in affecting change across campus*

In keeping with IDEAL's goal of making equity and inclusion commonplace, the next section of our report examines the depth of engagement that each of the tactics catalyzed.

## Developmental Impact of the DAP work

Equity and Inclusion work is categorized into three different types of impact. We painstakingly categorized each met tactic into one of the following categories based on typologies from research on equity and inclusion in higher education:[vi]

**Emerging:** Work that focuses on raising awareness about equity, inclusion and diversity. It is often symbolic, occurring at the surface of the organization. Typically, it is transactional in nature and not directly linked to levers of institutional change. Although this work is usually driven by leadership, some emerging efforts may build upon local grassroots ideas and initiatives.

**Developing:** Efforts focused on putting infrastructure, policies and processes into place. Developing efforts usually build on either pilot efforts or previous "emerging work." Developing work often focuses on building relationships and making connections between awareness and practice.

**Transformative:** Efforts focused on the bones and sinew of the organization, with intentionality about shifting the culture, norms, policies and process toward significantly increased inclusion, equity and diversity. Program design at this stage is highly participative, including actors at different levels of the organization, while focusing on developing high-impact processes within units and across campus. While emerging and developing work are important in building muscle for change, it is transformative work that actually shifts the climate and culture of institutions, often in inclusive and anti-oppressive ways.

Thirty-eight percent of the met tactics fall into the emerging category (Figure 7). These included one-time programs, beginning efforts or transactional events. It is work aimed at getting faculty, staff and students who are either new to the work or resistant to the work, involved. Efforts include inviting URM researchers to give talks on campus (LCB), convening events that celebrate different cultures and experiences (PDX), community collaborations on immigration issues (LERC); highlighting URM populations in newsletters (VPRI); embedding diversity in website design (DGE); encouraging professional development for women and minorities (GC); increasing awareness of implicit bias (SOMD) and promoting inclusion in the work environment (OMBUDS).

Just over 50% of the met tactics fall into the developing category: developing and empowering diversity committees (CAS), establishing equity research groups (COD), prioritizing hiring in programmatic areas that enhance diversity (COE), developing an engagement plan focused on staff retention (IS), developing internship programs that bring Black, Indigenous, Latinx, Asian, Desi, Pacific Islanders and women into careers where they are previously underrepresented (VPFA, SSEM, DEI,

# IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus

ADV,VPSL), embedding equity and inclusion into annual performance reviews (SSEM, VPSL), collaborating with Latinx community partners to create a more welcoming environment (JSMA), incorporating accessibility as a criteria for library collections (LIBR); embedding diversity into curriculum (CHC); leadership development and consulting with unions on Labor issues (LERC); Everyday Inclusion, a robust professional development series (VPFA); and incorporating implicit bias into hiring procedures (UESS).

The smallest percentage of met tactics is in the transformative category: employing universal design for building (Knight Campus), or sharing authority with the diversity committee to evaluate a VP's performance in ways that generate meaningful accountability around equity and inclusion (Advancement); conducting exit interviews to ensure that departing employees have opportunities to express concerns and incorporate relevant feedback into policies and processes (LAW); Revising RFP and RFQ documentation to make processes more accessible to small, minority and women-owned businesses (PCS); changing performance evaluation processes to include diversity/inclusion components (ATH); institutionalizing the work of diversity committees in college-level decision-making (CAS) and reforming the multicultural requirement in ways that focus on power, agency and difference (TEP and OtP). In the section below, we examine how IDEAL impacted our staff, students, faculty, community partners and alumni, as it was being implemented.

## DAP Constituencies

Each unit had the opportunity to choose constituency groups. Figure 8 shows that nearly a quarter of all of our DAPs focused on either undergraduate or graduate students, followed by a general focus on all campus constituents. Staff were the third most popular focus of the DAPs, with other foci including community, faculty, and mixed-constituency. In keeping with our goal to become an IDEAL campus, community and State, DAP work also extended to community partners, with a sliver of the work impacting our alumni as well.



*Figure 8* Constituencies served through units' met DAP tactics

Another important over-arching goal of IDEAL is to create a campus where underrepresented groups can grow and thrive. Figure 9 explores how DAP implementation was distributed among underrepresented constituencies on our campus. Of the DAPs that focused on underrepresented

# IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus

populations, 15% focused on all underrepresented communities. Underrepresented groups most likely to be named are Indigenous, disabled, women, Latinx and international communities. Blacks received very little targeted focus and Asians were not singled out as an area of focus.



*Figure 9* *Underrepresented groups specifically served through units' met DAP tactics*

Thus far, our analyses have helped us to understand what we have accomplished across campus. At this juncture, we explore how the DAP work was received and evaluated by external audiences.

## Catalyzing Change

The diligent work developed under the auspices of IDEAL by staff, faculty, students and leadership, catalyzed change in ways that were recognized and applauded by groups and organizations beyond our campus. A few of the highlights are outlined below:

- Two years into the work of IDEAL, the Oregon Department of Education informed us that they were using IDEAL as a basis for establishing their own internal plan.
- The UO Department of Intercollegiate Athletics identified IDEAL as a major partner driver in their success of BEOREGON, which received the National 2020 NCAA/MOAA Diversity and Inclusion Award.
- Communications received 2020 Best of CASE (Council for Advancement and Support of Education) for PATOS: a multimedia approach to supporting the UO Latinx community
- In September 2020, UO received its first Insight into Diversity Higher Education Excellence in Diversity (HEED) recognition, which is given to schools for excellence in diversity and equity on their campus.

## From Mono-culturalism to Resiliently Inclusive: Data Highlights on the Journey Forward

Our DAP implementation process is designed to develop muscle memory and capacity to move the UO from being a mono-cultural institution, where racial exclusion was the norm, to a resiliently inclusive multicultural institution. Inclusive multiculturalism exists when traditionally marginalized individuals and groups feel a sense of belonging and are empowered to participate and lead in majority culture as full and valued members of the community, shaping and redefining that culture in

# IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus

equitable and anti-oppressive ways. The data below provides a snapshot of representation among senior leadership, officers of administration, faculty, women in science, classified staff, graduate employees and female faculty of color.

## University Leadership and Officers of Administration



**Figure 10** *Compares UO Administrators' gender and ethnicity in 2015 to 2020. Source: UO Institutional Research*

Diversity among campus leadership is a crucial indicator of inclusion. After all, leaders play an important role in designing policies that shape climate, resource mobilization and success. Figure 10 illustrates growth in the representation of women, Black and Latinx administrators,[1] as well as an increasing percentage of administrators whose race and ethnicity are unknown. Men still predominate the ranks of UO leadership. Asians are currently invisible at the highest ranks of UO leadership, a problematic and all too common situation in higher education considering the overrepresentation of Asian faculty and students. The changes in UO senior leadership are a result of a number of intersecting factors: intentionality of active recruitment practices, protests by the BSTF, and a clarion call by women in all aspects of campus life demanding that the UO hire more female leaders. The achievements made, however, are fragile. Underrepresented leaders must be nurtured, respected and provided with opportunities to advance if they are to remain in leadership positions on our campus.

---

[1] Since 2014-15, "Administrators" is defined as the President, Senior Vice President & Provost, all Deans, Vice Presidents, Vice Provosts, the General Counsel, and the Athletic Director. Source: Office of Institutional Research.

# IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus



*Figure 11 Officers of administration of color as a percentage of all OAs from AY 2010 to AY 2019. Source: UO Institutional Research*

Diversity in the ranks of Officers of Administration (OAs) is essential to an inclusive and multicultural institution, but Figure 11 shows only incremental progress. Since 2015, Latinx OAs have increased by a little over a percentage point, while OAs who are Black and Asian have each increased by a little under a percentage point. Pacific Islander or Native OAs were already a tiny proportion of the OA population, and since 2015, these groups have declined.

## Faculty, Classified Staff, and Graduate Employees



*Figure 12 Tenure track faculty of color as a percentage of all TTF from AY 2010 to AY 2019. Source: UO Institutional Research.*

# IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus

Since 2015, the UO has made some progress in faculty diversity but the larger landscape of faculty diversity remains unchanged, with increases of less than 1% change over the last five years. Modest increase have occurred with Latinx and Black faculty. The percentage of Native faculty remained unchanged, while the percentage of Asian faculty slightly decreased.



NON-TENURE TRACK FACULTY OF COLOR

| | 2015-16 | 2016-17 | 2017-18 | 2018-19 | 2019-20 |
|---|---|---|---|---|---|
| ■ Two or more races | 1.2% | 1.1% | 1.4% | 1.3% | 1.0% |
| ■ Native Hawaiian or Other Pacific Islander | 0.20% | 0.20% | 0.20% | 0.30% | 0.20% |
| ■ Hispanic or Latino | 3.90% | 4.10% | 4.10% | 4.10% | 4.10% |
| ■ Black or African American | 1.10% | 1.10% | 1.00% | 1.00% | 1.00% |
| ■ Asian | 4.40% | 4.90% | 4.70% | 4.70% | 4.90% |
| ■ American Indian or Alaska Native | 0.70% | 0.80% | 0.50% | 0.40% | 0.30% |

*Figure 13* *Non-tenure track faculty of color as a percentage of all NTTF from AY 2010 to AY 2019. Source: UO Institutional Research*

Racial diversity among our non-tenure related faculty remains largely unchanged with tiny shifts in the representation of Latinx faculty and minor gains of less than one percent among Asian and Native Hawaiian faculty. The ranks of Black and Native NTTF decreased.



*Figure 14* *Women in the Sciences 2015 V 2020*

Figure 14 shows changes in the placement of women in STEM. Advocacy among women scientists as well as active recruitment strategies were important in breaking through stagnation. While modest hiring and/or promotions have taken place across the sciences, the largest increases have occurred in biology and psychology.

Except for moderate increases in classified staff (Figure 15) who identify as Latinx or biracial, classified staff also remain mostly white.

## IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus



*Figure 15* *Classified staff of color as a percentage of all classified staff from AY 2010 to AY 2020. Source: UO Institutional Research*

Staff who identified as Pacific Islander or Native American decreased since 2015. With only a slight uptick of less than 1%, the representation of Black and Asian classified staff remained largely the same.



*Figure 16* *Graduate employees of color as a percentage of all GEs from AY 2010 to AY 2019. Source: UO Institutional Research*

Racial diversity among our graduate students has changed little since 2015. Apart from Latinx and/or multiracial students, change among Pacific Islander, Asian, Black and Native America students has either remained basically flat or declined.

## IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus



**Figure 17** *Percent of faculty hired since AY 2013-14 who are no longer at the UO in AY 2019-20. Source: UO Institutional Research*

Figure 17 captures the turnover rates for tenure-related faculty—which reflect the percentage of faculty who are no longer at the UO. This percentage is important because it helps us to understand whether or not the UO is a destination spot or a revolving door. White faculty and Asian faculty, respectively, have the lowest turnover rates, followed by Latinx faculty. The next layer of turnover is for non-resident Alien and multiracial faculty. Black faculty comprise the third level, leaving the university at almost 3 times the rate of similarly situated white faculty.



**Figure 18** *Female tenure related faculty of color in 2015 and in 2019. Source: UO Institutional Research.*

# IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus

For women of color who stay at the UO, there is increased progress in movement through the ranks, thanks in part to the efforts of the CSWS Women of Color Working Group. Women of color faculty comprise almost 29% of the associate professor ranks compared to 20% three years ago. Additionally, as compared with 2015, when there were no Black or Native women[vii] who were full professors, 2019 saw the promotion/hiring of Native and Black faculty in each of these categories. Asian, Latina and biracial/multicultural women faculty continue to be promoted. As we will see below, faculty turnover and advancement have implications for student belonging and success. In the next section, we examine student success for all our under-represented students.

## Student Success



Figure 19 Other graduation rate trends. Source: Undergraduate Education & Student Success

Figure 19 shows that although the overall achievement gap continues to widen, the UO witnessed marked improvement for Pell eligible, first generation and underrepresented students since the beginning of the DAP work in 2015 until 2018, the last year for which we have graduation data. Underrepresented students made the largest progress.



Figure 20 Six-year graduation rates based on beginning cohort years 2010-2014. Source: UO Institutional Research

# IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus

When we review disaggregated data, however, we see improvements across each of these groups, with the stark exception of Black students. Black students' 6-year graduation rate was just shy of 69% in 2016, and worsened to 66% in 2019. Perhaps, there is a link between the high turnover rate for black faculty and lower patterns of success for black students. Research shows that black faculty historically play a crucial role in the success of black students. Thus, the final aspect of building a multicultural institution is to ensure equity in what we value and how we recognize success.

## Faculty Achievement

In this section, we focus on faculty achievement as measured by tenure, promotion and faculty awards. In addition to being shaped by race, the UO institutions are also gendered. Little changed since 2015, with women predominating among the non-tenure ranks and men predominating among the tenured ranks. This is not just a matter of semantics, but equity too. Tenure provides access to life-long job security and higher pay, while non-tenure positions constantly search for stability.



*Figure 21 Gender distribution of tenure-related faculty from AY 2010 to AY 2019. Source: UO Institutional Research*



*Figure 22 Gender distribution of non-tenure related faculty from AY 2010 to AY 2019. Source: UO Institutional Research*

Between 70 and 80% of all UO research awards are awarded to White faculty, with Asian and Latinx faculty, garnering few of these awards. In terms of gender, there is almost parity between men and women.

## IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus



Figure 23 *Race/ethnicity distribution of faculty research awards 2013-14 through 2019-20. Source: UO Institutional Research.*



Figure 24 *Gender distribution of Faculty Research Awards from 2013-14 through 2019-20. Source: UO Institutional Research*

When it comes to teaching awards (Figure 25), almost 80% of awards consistently go to white faculty. Only recently have Black faculty and Native faculty received these awards. In terms of gender, men have received almost 2 of every 3 awards.

## IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus



**Figure 25** *Race/ethnicity distribution of faculty teaching awards 2013-14 through 2019-20. Source: UO Institutional Research.*



**Figure 26** *Gender distribution of faculty teaching awards 2013-14 through 2019-20. Source: UO Institutional Research.*

The racialized and gendered patterns observed in the awards process demonstrate the need to examine and redesign these processes to ensure the talents and contributions made by women and people of color are recognized and valued. Without such recognition, their work and contributions are often appropriated without adequate compensation.

In some ways, the data raise additional and important questions about intersectionality, as well as how our disabled and LGBTQ students and colleagues are faring. The lack of data transparency,

# IDEAL: Our Roadmap for a Fully-Inclusive and Resilient Campus

especially around issues of race, limits our ability to intentionally track progress on these important issues.

## Failing Forward and Recommended Next Steps

In many respects, the DAP implementation process is reminiscent of Dickens' Tale of Two Cities, largely because of the specter of dualism. On one hand, the DAP implementation showcased the UO's innovative, scrappy, can-do attitude. Our work helped our campus develop a common language, collaborate in building the UO's muscles in these areas and focus campus efforts on issues that have, for too long, lacked consistent focus. In less than 3 years, campus units contributed over 250 programs, events, processes and policies. Considering Oregon's history of exclusion and colonization, this progress is significant. However, the DAP implementation process tells only part of our story.

The other side, told by the data about representation, student success and faculty achievement, presents a less flattering story—one of a campus that is mired in incrementalism—as it relates to diversity, equity and inclusion. This incrementalism chains the UO to its racially segregated past on a campus where colorblind ideology[viii] and whiteness prevail.[ix] To the extent that change has occurred in diversifying the ranks of women in science, UO senior administration and in the promotion of women faculty of color to associate and full professor ranks, they have been the exception to the rule. Specifically, these gains have occurred as a result of intentional outreach, targeted recruitment, student protests and organized faculty mobilization. Yet, absent from this progress are any Vice Presidents or Deans who identify as Native, Asian or Pacific Islander as well as the precarious representation of women in senior leadership ranks. This means that if the UO really intends to be a resilient, fully-inclusive institution, it must embed a culture of intentionality throughout its systems and processes. It must stridently and consistently choose a path of anti-oppression in word and as well as deed. Since a climate of belonging for all is important for faculty, staff and student retention, and since climate lives in structures, future work must focus on dismantling the behaviors and processes that make the UO a largely unwelcoming place for underrepresented faculty, staff and students across all identity lines, while embedding our practices, processes and systems with love, authenticity, courage and empathy.

Future work must also gauge our performance on key indicators of success, with consistent work in dismantling the attitudes, systems and processes that uphold implicit as well as explicit bias and discrimination. The journey ahead is too important, and the work too consequential to leave it undone. We invite your renewed commitment to and participation in the next leg of our journey.

## Endnotes

[i] It takes a team to complete any worthwhile project. Such is the case with this Report. I am grateful to each colleague in the Division of Equity and Inclusion for their commitment and support. I am also grateful to the President's Diversity Advisory Community Council (PDACC), for their consistent support and untiring commitment to helping shape our campus into a more just and hospitable place.  Tracy Bars served as the project manager for DAP implementation, and I am grateful for her data management skills and creativity. JP Monroe provided data access along the way. Members of the DEI Executive Team—including Vickie (2017-2019), Charlotte, Lesley-Anne and Kelly, were invaluable thought partners in helping to execute the DAPs across campus. Many thanks as well to President Schill, our supportive Board of Trustees, Senior Staff colleagues, Deans and Directors who provided support along the way. Above all, I am grateful to everyone who helped to design IDEAL, and who worked hard to implement DAPs across our campus. This report celebrates our collaborative work and invites everyone's leadership for the next leg of our journey.

[ii] For a timeline of IDEAL, please see the following: https://inclusion.uoregon.edu/framework-development-history

[iii] For more information about the equity work on our campus, please see the report below:
https://inclusion.uoregon.edu/sites/inclusion1.uoregon.edu/files/9_17_20_v8_uo_equity_document_fall_2020.pdf.

[iv] Climate Survey Development and Analytics; Evaluate Existing Workshops, Professional Development Programs / Gap Analysis; Implicit Bias Professional Development; Leadership Succession Planning; Onboarding and Training for New Employees & New Supervisors; Professional Development Pilot Projects; Recruiting Processes, Outlets & Retention Tools

[v] Our initial team of three include Vickie DeRose, Lesley-Anne Pittard and myself (Yvette Alex-Assensoh). When Vickie completed her term as CoDaC Director, Charlotte Moats-Gallagher, the new CoDaC Director joined the team and helped to complete the review process.

[vi] Damon Williams. 2013. Strategic Diversity Leadership: Activating Change and Transformation in Higher Education. New York Stylus.

[vii] There has been at least one black female faculty member at full professor rank, but she is counted in the administrative rather than the faculty ranks.

[viii] Color blindness is the idea that race-based differences don't matter. It ignores the realities of systemic racism.

[ix] For example, in 2020, there are entire departments that have never hired a Black or Indigenous faculty member or postdoc.

**Exhibit 2**

# Communication Manager

## tova stabin

*Communication Manager*

tstabin@uoregon.edu

Ms. tova stabin is part of the UO internal and executive communications team working as the Communication Manager for the Division of Equity and Inclusion. She has more than 20 years of communications experience including in writing, editing, digital and social media, website content development and strategic planning. She most recently worked as Communication Specialist at Parenting Now, as a writer for Thomas Riggs' encyclopedias, and ran her own consulting firm, Diversity Education and Information Services, with clients that included Lane Community College, Northwest Library Association and the City of Eugene. Her writing has been published widely locally and nationally and she is the recepient of a number of writing awards and fellowships. She has a BA in English and Women's Studies; a Masters of Library and Information Science; and a Master's Certificate in Integrative Administration. She is also an avid social justice activist, reader, gardener, an active member of Temple Beth Israel and proud parent.

As Communication Manager, she will be working on all digital and print communication, including social media, website content and design, internal and external communication, as well as working on strategic communication planning.

Human Resources (https://budgetgrp.uoregon.edu/careers//)

**Exhibit 3**

## Communications Manager

(/en-us/latest_jobs.rss)

> **Apply now** (https://secure.dc4.pageuppeople.com/apply/726/gateway/default.aspx?
> c=apply&lJobID=530001&lJobSourceTypeID=831&sLanguage=en-us)

**Job no:** 530001
**Work type:** Officer of Administration
**Location:** Eugene, OR
**Categories:** Administrative/Professional, Communications/Public
Relations/Marketing, Diversity, Equity, and Inclusion

**Department:** Division of Equity & Inclusion
**Appointment Type and Duration:** Regular, Ongoing
**Salary:** Commensurate with experience
**FTE:** 1.0

Application Review Begins

September 12, 2022; position open until filled.

Special Instructions to Applicants

Please submit the following with your online application:
• A cover letter in which you clearly describe how your knowledge, skills, and
abilities prepare you for the job responsibilities and requirements outlined
in the job announcement.
• A resume of your educational and professional work experience.

Please Note: We may contact applicants who meet the minimum
requirements in the job posting to request additional information for the
next stage of review.

Department Summary

The Division of Equity and Inclusion (DEI) works to build capacity for UO's
global leadership around policies, practices, and programs for equity,
inclusion, and diversity. DEI promotes inclusive excellence by working to
ensure equitable access to opportunities, benefits, and resources through
engagement with the campus and the community. As a part of our efforts,
we design and implement campus-wide programs to recruit and retain a
diverse community of student, staff, faculty, and community partners.

---

Sign In
(https://secure.dc4.pageuppeople.com/apply/726/
sLanguage=en-us)

**POSITION SEARCH**

e.g. "Research", "Associate,
Eugene"

Filter results

## Work type

☐ **Classified Staff (46)**
☐ **Coaches (3)**
☐ **Faculty - Career (46)**
☐ **Faculty - Other (34)**
☐ **Faculty - Pro Tempore (115)**
☐ **Faculty - Tenure Track (17)**
☐ **Officer of Administration (95)**

## Locations

United States
☐ **Charleston, OR (3)**
☐ **Eugene, OR (332)**
☐ **Other-Site (14)**
☐ **Portland, OR (21)**

## Categories

☐ **Academic Advising/Support (11)**
☐ **Accounting/Finance (5)**
☐ **Administrative/Office Support (29)**
☐ **Administrative/Professional (56)**
☐ **Admissions/Financial
Aid/Enrollment Management (11)**
☐ **Anthropology (6)**

DEI is comprised of five units and portfolios: Office of the Vice President for Equity and Inclusion, Campus and Community Engagement, the Center for Multicultural Academic Excellence, the Center on Diversity and Community, and the Multicultural Center. We are a caring and creative team who work to nurture relationships, build institutional capacity for transformative change, and inspire acts of love, authenticity, courage, empathy, brilliance, and justice at the University of Oregon.

## Position Summary

Reporting directly to the Vice President for Equity and Inclusion, the Communications Manager is responsible for the development and implementation of strategic communications for DEI and all of its units, and provides strategic counsel and communications expertise in support of campus-wide diversity efforts, programs, and initiatives that serve the equity and inclusion goals and educational mission of the university.

The Communications Manager is accountable for all of the division's external communications, ensuring that DEI's objectives and outreach are clear and effective. In addition to leading the division's communications strategy, duties include: creating written and graphic content for both web and print media, marketing events and programs effectively to a range of audiences, managing DEI's social media accounts and contact database (CRM), supervising student design and communications staff as well as occasional freelancers, providing occasional research and event support, and responding to media requests. This position works closely with colleagues in University Communications as well as external stakeholders and community members.

The Communications Manager will be a leader in the division and must have a nuanced understanding of intersectional diversity, equity, and inclusion issues facing higher education. The person in this role will be a creative, detail-oriented project manager with a passion for the values of social justice and anti-racism, and the potential that communications can have to build inclusive community and effect positive change. The person in this position will work well under pressure, adapt quickly to change in a dynamic environment, and be comfortable working effectively both independently and collaboratively in a flexible and collegial manner.

## Minimum Requirements

• Bachelor's degree or equivalent combination of skills and experience in the area of Communications, Public Relations, Journalism, or related field.
• Three years' work experience in communications, public relations, or related fields.
• Experience providing strategic communications with/for diverse and historically underserved populations, and/or on equity, inclusion, and diversity-related issues.

☐ **Architecture/Art/Design (18)**
☐ **Arts/Theater/Museum (5)**
☐ **Athletics (11)**
☐ **Biology/Life Sciences (37)**
☐ **Business Administration/Management (31)**
☐ **Chemistry (16)**
☐ **Child Development (19)**
☐ **Communications/Public Relations/Marketing (15)**
☐ **Computer and Information Science (14)**
☐ **Construction/Planning (2)**
☐ **Custodial (2)**
☐ **Data Science (10)**
☐ **Development (12)**
☐ **Diversity, Equity, and Inclusion (8)**
☐ **Earth Science (6)**
☐ **Economics (3)**
☐ **Education (31)**
☐ **Engineering/Biomedical Engineering (19)**
☐ **English (4)**
☐ **Environmental Studies (4)**
☐ **Executive/Management/Director (26)**
☐ **Facilities/Grounds/Skilled Trades (7)**
☐ **Food Service/Hospitality (9)**
☐ **Foreign Languages/Linguistics (10)**
☐ **Geography (2)**
☐ **Healthcare/Nursing (10)**
☐ **History (6)**
☐ **Human Physiology (10)**
☐ **Human Resources (2)**
☐ **Humanities (4)**
☐ **Information Technology (16)**
☐ **Instruction (87)**
☐ **International Affairs (4)**
☐ **International Studies (7)**
☐ **Journalism/Communication (8)**
☐ **Legal/Law (14)**
☐ **Library (7)**
☐ **Math (7)**
☐ **Music/Dance (7)**
☐ **Natural Science (9)**
☐ **Neuroscience (10)**
☐ **Operations/Infrastructure (15)**
☐ **Other (12)**

## Professional Competencies

· Demonstrated understanding of the intersectional barriers facing historically and persistently underserved communities (Black, Native and Indigenous, Latino/a/x, Asian, Desi and Pacific Islander, and other people of color; LGBTQIA+ individuals; people with disabilities; and members of groups underrepresented in higher education including religion, first-generation, non-traditional, Dreamers, and others) as evidenced by professional and/or life experiences or educational background.
· Excellent verbal, written, and interpersonal skills with the ability to communicate in a manner that consistently demonstrates respect, concern, and responsiveness.
· Demonstrated ability to write, edit, and create content effectively for a variety of audiences through various media (print, web, social media, etc.).
· Cultural humility and ability to integrate principles of diversity, equity, and inclusion into written, visual and other communications.
· Ability to work effectively with students, faculty, staff, and administrators from diverse backgrounds.
· Familiarity with media accessibility requirements, including Section 508 ADA accessibility standards.
· Strong organizational skills, including an ability to manage time and projects efficiently in a dynamic environment of shifting priorities and critical communications.

## Preferred Qualifications

· Master's Degree in a field related to position.
· Professional experience in higher education.
· Experience supervising students in a higher education environment.
· Experience with public speaking and/or providing training on diversity, equity, and inclusion-related issues.
· Experience working with journalists and other members of the media.
· Experience or proficiency with Adobe Creative Suite, Drupal, and other editing platforms, with a working understanding of design, graphic art, photography, and videography concepts and needs.
· Experience or proficiency with web content management, social media platforms, constituent relationship management (CRM) systems, and information architecture.

**FLSA Exempt:** Yes

........................................................................................

**All offers of employment are contingent upon successful completion of a background inquiry.**

University of Oregon students and employees are required to be fully vaccinated against COVID-19. For additional information see:
https://coronavirus.uoregon.edu/vaccine (https://coronavirus.uoregon.edu/vaccine).

☐ **Philosophy/Religion (3)**
☐ **Physics (12)**
☐ **Planning/Project Management (1**
☐ **Political Science (2)**
☐ **Psychology (16)**
☐ **Public Policy and Planning (5)**
☐ **Research/Scientific/Grants (101)**
☐ **Social Science (8)**
☐ **Sociology (2)**
☐ **Student Life/Services (22)**
☐ **Women's and Gender Studies (3)**

**Subscribe to jobs** (/en-us/subscribe/)

The University of Oregon is proud to offer a robust benefits package to eligible employees, including health insurance, retirement plans and paid time off. For more information about benefits, visit http://hr.uoregon.edu/careers/about-benefits (http://hr.uoregon.edu/careers/about-benefits).

The University of Oregon is an equal opportunity, affirmative action institution committed to cultural diversity and compliance with the ADA. The University encourages all qualified individuals to apply, and does not discriminate on the basis of any protected status, including veteran and disability status. The University is committed to providing reasonable accommodations to applicants and employees with disabilities. To request an accommodation in connection with the application process, please contact us at uocareers@uoregon.edu (mailto:uocareers@uoregon.edu) or 541-346-5112.

UO prohibits discrimination on the basis of race, color, sex, national or ethnic origin, age, religion, marital status, disability, veteran status, sexual orientation, gender identity, and gender expression in all programs, activities and employment practices as required by Title IX, other applicable laws, and policies. Retaliation is prohibited by UO policy. Questions may be referred to the Title IX Coordinator, Office of Civil Rights Compliance, or to the Office for Civil Rights. Contact information, related policies, and complaint procedures are listed on the statement of non-discrimination (http://studentlife.uoregon.edu/nondiscrimination).

In compliance with federal law, the University of Oregon prepares an annual report on campus security and fire safety programs and services. The Annual Campus Security and Fire Safety Report is available online at https://clery.uoregon.edu/annual-campus-security-and-fire-safety-report (https://clery.uoregon.edu/annual-campus-security-and-fire-safety-report).

**Advertised:** Aug 11, 2022 Pacific Daylight Time
**Applications close:**

| Back to search results (/en-us/listing/?) |
| --- |

| Apply now (https://secure.dc4.pageuppeople.com/apply/726/gateway/default.aspx?c=apply&lJobID=530001&lJobSourceTypeID=831&sLanguage=en-us) |
| --- |

| Refer a friend |
| --- |
| (https://secure.dc4.pageuppeople.com/apply/726/gateway/default.aspx?c=employeereferral&lJobID=530001&lJobSourceTypeID=831&sLanguage=en-us&sHome=https%3a%2f%2fcareers.uoregon.edu%2fen-us%2fjob%2f530001%2fcommunications-manager%2f%3fts%3d1660340584065) |

# Share this:                  |

More (http://www.addthis.com/bookmark.php?v=250&username=pageup)

Powered by PageUp (https://www.pageuppeople.com/powered-by-pageup/)

CAREERS (HTTP://HR.UOREGON.EDU/JOBS/AVAILABLE-POSITIONS)

PRIVACY POLICY (HTTP://REGISTRAR.UOREGON.EDU/RECORDS-PRIVACY)

ABOUT (HTTP://UOREGON.EDU/ABOUT)

FIND PEOPLE (HTTP://UOREGON.EDU/FINDPEOPLE/)

(HTTP://UOREGON.EDU?
UTM_SOURCE=BANNER-

MODULE&UTM_CAMPAIGN=FOOTER)

© UNIVERSITY OF OREGON (HTTP://UOREGON.EDU).  ALL RIGHTS RESERVED.

UO (University of Oregon) prohibits discrimination on the basis of race, color, sex, national or ethnic origin, age, religion, marital status, disability, veteran status, sexual orientation, gender identity, and gender expression in all programs, activities and employment practices as required by Title IX, other applicable laws, and policies. Retaliation is prohibited by UO (University of Oregon) policy. Questions may be referred to the Title IX Coordinator, Office of Affirmative Action and Equal Opportunity, or to the Office for Civil Rights. Contact information, related policies, and complaint procedures are listed on the **statement of non-discrimination (http://studentlife.uoregon.edu/nondiscrimination)**.

(https://uoregon.edu?
utm_source=banner-

**Exhibit 4**

# University Communications (/)

# Social Media Guidelines

The University of Oregon encourages units to explore social media and to decide if it is right for them. Before you get started with any social media platform, we ask that you do the following:

- Complete our social media checklist below, which will provide you with a strong foundation to build and maintain your presence or, equally important, help you decide not to develop a departmental presence.

- Assign a faculty or staff member from your division, unit, or office to oversee all accounts. A UO faculty or staff member must have administrative privileges to all accounts and is responsible for controlling permissions and security to the accounts.

> Social Media Brand Requirements (/brand/social-media)

# How to Identify Your UO-related Social Media Presence

When naming your unit's social media presence, clearly and concisely identify your specific unit. Do not name your page in such a way that it might be confused with a general page representing the entire UO, or with any other UO unit.

Add the institution name "University of Oregon" or "UO" before your unit name; i.e.' "University of Oregon Admissions" or "UO Admissions," not "Admissions at the University of Oregon," "Admissions – University of Oregon," or simply "Admissions." If necessary, an emdash can separate the institution and unit names: "University of Oregon—Admissions."

Correct names might include:

University of Oregon Department of Romance Languages
UO Registrar
University of Oregon Admissions

# Engagement, monitoring and responding to comments

When launching a social media account, be prepared` to monitor the comments that will get posted. As a public university that values freedom of speech and a robust exchange of ideas, you should err on the side of letting people have their say when commenting on our social media properties. When appropriate, engage with commenters and repliers, even if it's just to like or reply to their comments or to acknowledge their criticism. Don't delete comments or block users because they are critical or because you disagree with the sentiment or viewpoint. But you may remove comments, messages and other communications and restrict access to users who violate the following guidelines:

- Post violent, obscene, profane, hateful or racist comments or otherwise uses offensive or inappropriate language
- Threaten or defame
- Post comments that are out of context, off topic or not relevant to the topic at hand
- Disclose personally identifiable information, such as addresses or phone numbers
- Include copyrighted materials
- Fall under the category of spam
- Suggest or encourage illegal activity
- Solicit, advertise or endorse a third-party business or service
- Are multiple successive posts by a single user
- Are disruptively repetitive posts copied and pasted by multiple users

If a user engages in particularly egregious behavior, or continues to post comments in violation of our standards (i.e.: replies repeatedly with comments that are off topic and that don't contribute to meaningful dialogue), you have the the right to ban or hide the user.

---

# Social Media Terms and Conditions

EXHIBIT 1
Page 2 of 3

If you'd like to take your school, college, or unit into the realm of social media, the UO requires that you follow the terms of service and conditions of your chosen platform. Learn about the terms and conditions of the major social media platforms at the links below.

Facebook (https://www.facebook.com/legal/terms)

Instagram (https://instagram.com/about/legal/terms/

Twitter (https://twitter.com/tos)

Snapchat (https://www.snapchat.com/terms)

YouTube (https://www.youtube.com/t/terms)

LinkedIn (https://www.linkedin.com/legal/user-agreement)

# Using Social Media Brand Assets

Popular social media platforms like Instagram and Twitter have their own brand standards which must be followed. Access their guidelines and asset downloads in the social media section (/brand/social-media) of our brand and style guide.

Popular Social Media Brand Assets (/brand/social-media/#social-brand-assets)

SOCIAL MEDIA (/SOCIAL-MEDIA)

## Social Media Guidelines (/social-media-guidelines)